```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
MICHELLE TRAWINSKI, on behalf of herself  :
and all others similarly situated,        :
                                          :
                Plaintiff,                :
                                          :
        -against-                         :
                                          :   11 Civ. 2978 (PAC)
KPMG LLP                                  :
                                          :   OPINION & ORDER
                Defendant                 :
--------------------------------------------------------------- x
```

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  December 21, 2012
```

HONORABLE PAUL A. CROTTY, United States District Judge:

On May 3, 2011, plaintiff Michelle Trawinski ("Trawinski") filed a class action complaint against KPMG LLP ("KPMG"), her former employer, alleging violations of the Fair Labor Standards Act ("FLSA"), and the New York Labor Law ("NYLL"). She claims that she was not paid time and a half for work in excess of forty hours per week, and that the professional and administrative exemptions claimed by KPMG are inappropriate. Four additional former KPMG employees, Lisa Wei ("Wei"), Michael Segretto ("Segretto"), Frank Adams ("Adams"), and Christopher Sindoni ("Sindoni") joined as opt-in plaintiffs, pursuant to Section 216(b) of the FLSA. Dkt. Nos. 14, 42-44. Sindoni and Adams subsequently dismissed their claims with prejudice. Stip. & Order, Dkt. No. 54. Trawinski now seeks conditional collective, and class action, certification. KPMG opposes both forms of certification. For the reasons stated below, the Court grants Plaintiff's motion to conditionally certify the collective action under 29 U.S.C. § 216(b), but denies the motion to certify the Rule 23 class action.

## BACKGROUND

KPMG is an "audit, tax and advisory firm" with approximately 138,000 employees. Class Action Complaint at ¶ 2, Dkt. No. 1 ("Compl."). The Advisory department is organized into Management Consulting, Risk Consulting, and Transactions and Restructuring service groups, each of which is further divided into service lines. Ex. E at 79. The Transaction and Restructuring service group is subdivided into Transactions, Corporate Finance and Restructuring service lines. Id. at 107-08. The Transactions service line is comprised of the Financial Due Diligence, Due Diligence for Lenders, Accounting Advisory Services, Strategic Services, and Infrastructure service networks. Id. at 108-09. Hierarchically, KPMG classifies its employees into five categories. From most junior to most senior, they are Associate, Senior Associate, Manager, Senior Manager or Senior Director, and Partner. Ex. F at 0013508-10.

Trawinski worked in KPMG's New York office as an Associate in the Transaction Services service line. Ex. C at 23-24. This is an entry level position, usually held by recent college graduates or those with minimal work experience. See Ex. L. She alleges that, as a Transaction Associate, she consistently worked more than 40 hour per week, Compl. at ¶ 49, but that she was prohibited from accurately keeping track of the total number of hours that she worked because not all of her work was billable to clients. Id. at ¶ 51. She did not receive overtime compensation for hours worked in excess of 40 hours per week, id. at ¶ 52, in alleged violation of both the FLSA and NYLL. See 29 U.S.C. § 207; N.Y. Comp. Codes R. & Regs. tit. 12 §142-2.2; see also In re Novartis Wage & Hour Litig., 611 F.3d 141, 157 (2d Cir. 2010) ("the overtime wage requirements of New York law . . . are not meaningfully different from the requirements of the FLSA"), abrogated on other grounds by Christopher v. SmithKline Beecham Corp., 132 S.Ct. 2156 (2012). Trawinski claims that the professional and administrative

employee exemptions asserted by KPMG are inappropriate because her work was not related to client management or general business operations, and did not involve the exercise of discretion and independent judgment regarding significant matters. Id. at ¶ 56. Trawinski now seeks compensation for her unpaid overtime and liquidated damages. Id. at 12.

Trawinski initially sought to bring this suit on behalf of all similarly situated current and former Associates in the Advisory department. Id. at ¶¶ 5-6. The instant motion substantially reduces the proposed FLSA collective to Associates within the Transactions service line, excluding members of the Infrastructure service network ("Transaction Associates"). Pl.'s Mem. of Law at 3, Dkt. No. 46. For purposes of the NYLL claim, the class is described more specifically as Transaction Associates who worked in New York between May 3, 2005 and the date of final judgment in this matter. Id. at 12.

## DISCUSSION

**I.  Fair Labor Standards Act**

   A.  Standard

§ 216(b) of the FLSA allows an employee to "assert claims on behalf of other 'similarly situated employees.'" Myers v. Hertz Corp., 624 F.3d 537, 542 (2d Cir. 2010). Similarly situated employees are required to "opt in" by filing a written consent to become part of the FLSA collective action and to be bound by the judgment. See id. Courts have discretion to "facilitate notice to potential plaintiffs to inform them of the pendency of an action and of their opportunity to opt in as represented plaintiffs." Jason v. Falcon Data Com, Inc., No. 09 Civ. 3990, 2011 WL 2837488, at *4 (E.D.N.Y. July 18, 2011).

The Second Circuit has adopted a two-step analysis for deciding whether to certify a collective action under the FLSA. Myers, 624 F.3d at 554-55. In the first stage of analysis, a

3

court determines whether notice should be sent to potential opt-in plaintiffs who may be "similarly situated" to the named plaintiffs, "thus issuing a 'conditional certification' of the collective action." Winfield v. Citibank, N.A., 843 F. Supp. 2d 397, 402 (S.D.N.Y. 2012). Plaintiffs' burden at this stage is minimal; they need only make a "modest factual showing" that they and potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law." Myers, 624 F.3d at 555 (quoting Hoffman v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997). Unlike the more stringent Rule 23 requirements, plaintiffs can satisfy this burden by showing that "'there are other employees . . . who are similarly situated with respect to their job requirements and with regard to their pay provisions.'" Myers, 624 F.3d at 555 (quoting Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1258-62 (11th Cir. 2008)).

In the second stage of analysis, following discovery, a court determines whether the "'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." Myers, 624 F.3d at 555. If the plaintiffs are not similarly situated, then the collective action may be "de-certified" and "the opt-in plaintiffs' claims may be dismissed without prejudice." Id.

B.  Analysis

At the initial notice stage, plaintiffs satisfy their "minimal burden" by demonstrating that other employees are similarly situated with regard to their positions, job requirements, compensation scheme, and whether they received overtime pay. See Salomon v. Adderley Indus., Inc., 847 F. Supp. 2d 561, 564 (S.D.N.Y. 2012); see also Pippins v. KPMG, No. 11 Civ. 377, 2012 WL 19379, at *8-10 (S.D.N.Y. Jan. 3, 2012) (analyzing whether plaintiffs were "'similarly situated with respect to (1) their job requirements, . . . (2) their pay provisions, . . .

4

and . . . are (3) classified as exempt pursuant to a common policy or scheme.'" (quoting Myers, 624 F.3d at 555)).

The personnel that Trawinski seeks to represent in the collective action consists solely of those who held the same position: Associates within the Transaction Services service line, excluding Associates within the Infrastructure service network. Pl.'s Mem. of Law at 3. KPMG's own "Snapshot" for Transaction Associates, which was created to show "what . . . this role in transaction services look[s] like," Ex. E at 152-53, indicates that these employees generally had the same job qualifications,[1] marketable skills and opportunities for development. Ex. L.

All Transaction Associates had the same general job requirements. KPMG used the same job posting to hire Transaction Associates across different office locations and regardless of service network. Ex. E at 255. The posting stated that Transaction Associates "[a]nalyze financial data to identify historical financial and operating trends[, p]articipate in buy-side and sell-side transaction advisory engagements, providing financial and operational due diligence assistance, asset based lending and accounting advisory services . . . [, p]rovide advice to clients regarding potential mergers and acquisitions and other related transactions[, and c]reate or design tailored transaction advisory reports . . . ." Ex. M at 17654. Internally, KPMG describes the roles and responsibilities of Advisory Associates as supporting their engagement teams with respect to "[d]ata gathering, analysis, and report consolidation[, p]roject plan execution[, w]orkpaper aggregation[, and t]eamwork and collaboration." Ex. F at 13510. The declarations and deposition transcripts of several former Transaction Associates show that, in practice, this

---

[1] There are slight differences for the typical entrance profile of Strategic Services Associates, who were expected to have academic backgrounds in finance and economics, rather than accounting, and to have "financial analysis/modeling skills" rather than "excel/data analysis and manipulation skills." Ex. L.

appears to have largely consisted of preparing for and conducting interviews, conducting various types of analysis, creating charts, and compiling, reviewing, verifying and inputting financial and operational data into Excel spreadsheets, PowerPoint presentations, and KPMG's proprietary software. See, e.g. Ex. A at ¶¶ 10-11; Ex. C at 47, 79; Ex. D at 293-95, 315-20; Ex. 5 at ¶ 9; Ex. 6 at ¶ 17; Ex. 9 at ¶ 15; Ex. 10 at ¶ 15; Ex. 11 at ¶ 16; Ex. 17 at 104-06, 117, 252-54, 257.

KPMG's submissions confirm that the types of work in which Transaction Associates are involved are largely consistent across the various service networks within the Transaction Services line. These include qualitative analysis, such as research and reviewing contracts, Ex. 1 at ¶ 42; Ex. 3 at ¶¶ 13, 22, 24; Ex. 4 at ¶¶ 20-21; quantitative analysis, Ex. 1 at ¶¶ 37, 41; Ex. 2 at ¶¶ 16, 19; Ex. 3 at ¶ 24; Ex. 4 at ¶¶ 13-14, 19, 21; gathering, reviewing and formatting data, Ex. 1 at ¶¶ 33-34, 38; Ex. 2 at ¶ 16; Ex. 3 at ¶¶ 16, 19, 26; Ex. 4 at ¶ 18; conducting interviews, Ex. 1 at ¶ 41, Ex. 2 at ¶¶ 16, 19; Ex. 3 at ¶¶ 13, 16; Ex. 4 at ¶¶ 13, 14, 18; substantive writing assignments, Ex. 1 at ¶ 43; Ex. 2 at ¶ 19; Ex. 3 at ¶¶ 16, 19, 22, 26; Ex. 4 at ¶¶ 15, 22; and participation in client meetings and presentations. Ex. 1 at ¶ 43, Ex. 2 at ¶¶ 16, 19; Ex. 4 at ¶ 15.

At the start of their employment, all Transaction Associates receive the same training to prepare them to satisfy their job requirements. Ex. E at 237-39; see also Exs. F, H, I, and R. Generally, their "primary roles were the same regardless of which director or manager [they] worked under," Ex. D at 320, and Transaction Associates from different service networks worked together on the same engagements. See, e.g., id. at 91, 100, 226. Similarly, Transaction Associates often worked on assignments from, or rotated to, different service networks. See, e.g., Def.'s Mem. of Law at 10 n.9; Ex. 1 at ¶¶ 49-50; Ex. 2 ¶ 23; Ex. 3 at ¶ 29; Ex. 6 at ¶¶ 10-11, 39; Ex. 10 at ¶¶ 10, 13; Ex. 12 at ¶ 5. Cumulatively, this suggests that the job duties for

Associates in various Transaction service networks were highly correlated, if not entirely interchangeable.

The Court has reviewed KPMG's response, which suggests that the Transaction Associates' duties qualify them for the administrative or professional exemptions to the FSLA. This is a merits argument, however, and is inappropriate at this stage of the litigation. The two-stage certification process "exists to help *develop* the factual record, not put an end to an action on an incomplete one." Pippins, 2012 WL 19379, at *12 (emphasis in original) (citing Kress v. PricewaterhouseCoopers LLP, 263 F.R.D. 623, 629 (E.D. Cal. 2009)).

Transaction Associates are compensated according to a common scheme. Trawinski states that "KPMG subjects all Associates to the same compensation policies and practices." Pl.'s Mem. of Law at 8. While none of the citations offered by Trawinski directly support this assertion, the record contains some circumstantial evidence that this may be accurate. Compare Ex. C at 24 (describing first-year salary as approximately $68,000 or $69,000 in addition to $3,000 signing bonus), with Ex. D at 21-22 (stating first-year salary as approximately $70,000 in addition to $3,000 signing bonus). At oral argument, KPMG's counsel confirmed that Associates are paid within a narrow salary range, noting variations based on location and whether an associate is CPA-eligible. Hr'g Tr. at 21-22, Nov. 7, 2012.

It is undisputed that KPMG classified all Transaction Associates as "exempt from overtime and the other allegedly relevant provisions of the FLSA." Ans. at 8-9, Dkt. No. 19. This "uniform classification is done without regard to any special or individualized functions that any particular . . . Associate performs or where the . . . Associate works or what type of companies he/she [works with]; there is, in short, no person-by-person determination of exempt or non-exempt status." Pippins, 2012 WL 19379, at *10. This factor militates strongly in favor

of granting certification under the FLSA. It cuts against KPMG's arguments that "Associates engage in work that varies substantially from engagement to engagement," Def.'s Mem. of Law at 15; and that "an individualized inquiry is necessary to adjudicate whether the professional exemption applies with respect to the actual duties of any given Associate." Id. at 22. Rather, KPMG's own "blanket determination is evidence that differences in the position, to the extent there are any, are not material to the determination of whether the job is exempt from overtime requirements." Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 159 (S.D.N.Y. 2008).

At the initial stage of the certification process, the issue "is not whether [Trawinski] and potential opt-in plaintiffs were identical in all respects, but rather whether they were subjected to a common policy to deprive them of overtime pay when they worked more than 40 hours per week." Salomon, 847 F. Supp. 2d at 565; see also Pippins, 2012 WL 19379, at *5 ("plaintiffs need only show that they are similar," not that they are "perfectly identical"). At oral argument, KPMG asserted that the Court should not conditionally certify the FLSA claim because this would simply mean that KPMG will move to decertify the case at some future point. Hr'g Tr. at 30, 37. This may be true, but it is entirely beside the point. At this stage of the litigation, a "fact-intensive inquiry is inappropriate" precisely because KPMG "will have an opportunity to argue that individual inquiries predominate over common issues, based upon the discovery, at the second phase." Salomon, 847 F. Supp. 2d at 565. Trawinski has satisfied her burden of making a modest factual showing that she and other employees were victims of a common policy or plan. Her motion for conditional certification of the FLSA collective action is therefore granted.

## II. Rule 23 Class Certification

### A. Standard

Class certification under Fed. R. Civ. P. 23 requires proof of numerosity, commonality, typicality and adequacy of representation.[2] Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 201-02 (2d Cir. 2008). Each of Rule 23's requirements must be proven by the preponderance of the evidence. Myers, 624 F.3d at 547. This is true even where a requirement overlaps with a merits issue in the case, but district courts should not make any factual findings or merits determinations that are not necessary for the Rule 23 analysis, and any such determinations made at the certification stage are "not binding on the trier of facts, even if that trier is the class certification judge." In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 40-41 (2d Cir. 2006).

### B. Analysis

#### 1. Numerosity

KPMG has identified approximately 125 individuals who worked in the same service networks as Trawinski and Wei in its New York office between May 3, 2005 and December 31, 2011. Bien Decl. at ¶ 10. Joinder of this many parties is not practicable. See Fed. R. Civ. P. 23(a)(1). Accordingly, "numerosity is presumed at a level of 40 members." Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 Newberg on Class Actions 2d (1985 Ed.) § 3.05). This threshold is easily exceeded here and KPMG does not dispute that the numerosity requirement is satisfied

---

[2] Because the Court concludes that Trawinski does not meet all of the requirements of Rule 23(a), it is not necessary to also address whether Rule 23(b) is satisfied.

*2. Commonality*

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2551 (2011) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 (1982)). It depends not so much on the "'raising of common questions'" as it does on "'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation," where "'[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers.'" Id. (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)) (emphasis in original). Trawinski submits that she satisfies the commonality requirement because there is a single question at the heart of this case: whether the work of a Transaction Associate is either professional,[3] administrative[4] – either of which would make it exempt from the FLSA's overtime wage requirements – or neither.

KPMG argues, *inter alia*, that employees who provide white-collar services, such as those at issue here, are engaged in administrative work. While other circuit courts appear to agree with this argument, see, e.g., Piscione v. Ernst & Young, LLP, 171 F.3d 527, 540 (7th Cir 1999), employees here in the Second Circuit perform "production" work – rather than administrative work – where they are engaged in "directly producing the good *or service* that is

---

[3] The "professional exemption" to the FLSA's overtime wage requirements applies to employees "[w]hose primary duty is the performance of work: (i) [r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or (ii) [r]equiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.300(a)(2) Work requires advanced knowledge if it is "predominantly intellectual in character" and "require[es] the consistent exercised of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.301(b). Professionals "generally use[] the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." Id.

[4] The "administrative exemption" applies to employees whose work is "directly related to the management or general business operations of the employer or the employer's customers" and "whose primary duty includes the exercise of discretion and independent judgment." 29 C.F.R. § 541.200(a). "To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers," which "may" apply to "Tax experts or financial consultants." 29 C.F.R. § 541.201.

the primary output of a business." Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009) (emphasis added). Davis involved a party employed as a mortgage underwriter. While he was a white-collar employee of a large financial firm, the Court nevertheless held that he was properly categorized as a non-administrative production worker because

> Underwriters at Chase performed work that was primarily functional rather than conceptual. They were not at the heart of the company's business operations. They had no involvement in determining the future strategy or direction of the business, nor did they perform any other function that in any way related to the business's overall efficiency or mode of operation. It is undisputed that the underwriters played no role in the establishment of . . . [the] policy. Rather, they were trained only to apply the . . . policy as they found it, as it was articulated to them.

Id. Whether Transaction Associates performed similarly formulaic work, such that they can also be categorized as non-exempt production workers, is a question to the proposed class. But this common question does not lend itself to the type of common answers that Dukes requires to satisfy commonality. See Dukes, 131 S.Ct. at 2551.

KPMG does not argue that all Transaction Associates are necessarily subject to the same exemption, nor that they are all exempt for the same reasons, but rather that they are all exempt for reasons as multitudinous as their varied assignments. See, e.g., Ans. at 8-9 (purported class members were exempt "pursuant to the professional, administrative, *and/or* executive exemptions, *or a combination thereof.*" (emphasis added)); Def.'s Opp'n at 21-22 (subset of purported class members qualify for professional exemption); Hr'g Tr. at 33 ("there are groups of employees within this group of employees for whom special defenses would apply."). This is particularly problematic because Trawinski seeks to certify a class including members of four separate service networks. While the roles played by Associates across the Transactions service line may be sufficiently similar to meet the FLSA's "considerably more liberal" standard, Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D.363, 368 (S.D.N.Y. 2007), commonality is

11

not satisfied where the "Plaintiff seeks to certify a class consisting of employees in a variety of jobs . . . that may be subject to *different* exemptions – for which different facts need be proved – or none at all." Romero v. H.B. Automotive Group, Inc., No. 11 Civ. 386, 2012 WL 1514810, at *19 (S.D.N.Y. May 1, 2012) (emphasis added).

Even within the same service network, though the types of assignments given to Associates may be similar, the specifics can vary widely. In particular, KPMG submitted declarations from four members of the Financial Due Diligence network who worked in the company's New York City office, as did Trawinski herself. While all four reported working on similar engagements, specifically potential corporate acquisitions and the raising of capital, their actual assignments showed minimal overlap. See Exs. 5, 6, 7, 9. In such a situation, the applicability of exemptions, and, in turn, the "proof of liability will not turn on what [the employer] did or did not do vis-à-vis the entire class, but rather what each member of the class does on a daily basis." Myers v. Hertz Corp., No. 02 Civ. 4325, 2007 WL 2126264, at *5 (E.D.N.Y. July 24, 2007), aff'd, 624 F.3d 537 (2d Cir. 2010). Under these circumstances, the Court determines that Trawinski has not met the commonality requirement of Rule 23(a).

### 3. *Typicality*

Because both commonality and typicality "serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence," Gen. Tel. Co. of Sw., 457 U.S. at 157 n.13, they "'tend to merge into one another, [such] that similar considerations animate [their] analysis.'" Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 175 (S.D.N.Y. 2008) (quoting Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997)). Courts often do not distinguish between these two elements

of Rule 23(a) and analyze them as one. See, e.g., id. at 175-76; Flores v. Anjost Corp., 284 F.R.D. 112, 124-28 (S.D.N.Y. 2012). For the same reasons discussed supra regarding commonality, the Court cannot conclude that "each class member's claim arises from the same course of events" or that "each class member makes similar legal arguments to prove the defendant's liability," and typicality is therefore not satisfied. Brown, 609 F.3d at 475.

Additionally, courts will deny class certification where the class representative is subject to a defense that would "pose an unacceptable risk of drawing attention away from the central issues in the litigation." In re Omnicom Group, Inc. Sec. Litig., No. 02 Civ. 4483, 2007 WL 1280640, at *5 (S.D.N.Y. Apr. 30, 2007). "While 'the defendant need not show at the certification stage that the unique defense will prevail,' the defendant must show that the claim is 'meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense.'" Blank v. Jacobs, No. 03 Civ. 2111, 2009 WL 3233037, at *5 (E.D.N.Y. Sept. 30 2009) (quoting Lapin, 254 F.R.D. at 179).

KPMG has done so here by introducing sufficient documentary evidence to call into question the typicality of Trawinski's experience at KPMG. See, e.g., Exs. 15, 24, 25, 26, 27(raising material questions concerning the adequacy of Plaintiff's job performance). Based on this showing, the Court determines that this defense – unique to Trawinski – would distract from the merits of the purported class members' case because its litigation would require considerable time and resources from both the parties and the Court. See Blank, 2009 WL 3233037, at *5. This provides an additional reason why typicality is not satisfied.

       4.    *Adequacy of Representation*

"To determine whether a named plaintiff will be an adequate class representative, courts inquire whether: '(1) plaintiff's interests are antagonistic to the interest of other members of the

13

class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" Cuevas v. Citizens Fin. Group, Inc., 283 F.R.D. 95, 100 (E.D.N.Y. 2012) (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)). "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class." Damassia, 250 F.R.D. at 158. There is no question as to the qualifications, experience and ability of Outten & Golden LLP and Fitapelli & Schaffer, LLP, to represent plaintiffs in class actions similar to the instant case. See, e.g., Mattheson v. Glazier Group, Inc., No. 09 Civ. 4214, 2011 WL 6268216, at *7 (S.D.N.Y. Dec. 13, 2011); O'Dell v. AMF Bowling Ctrs., Inc., No. 09 Civ. 759, 2009 WL 6583142, at *2 (S.D.N.Y. Sept. 18, 2009).

Nevertheless, for the reasons stated in the typicality section, the Court cannot find that Trawinski would be an adequate representative of the class. There is overlap between the typicality and adequacy requirements, and the Second Circuit has not clearly delineated between them. Rocco v. Nam Tai Elecs., 245 F.R.D. 131, 135 (S.D.N.Y. 2007). In particular, "'where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation,' certification for the class is improper because he or she can no longer act in the best interest of the class." Id. (quoting Baffa, 222 F.3d at 59). Such is the case here.

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Plaintiff's motion to conditionally certify the collective action under the FLSA, and DENIES Plaintiff's motion to certify the NYLL class action pursuant to Rule 23.

Dated: New York, New York

December 21, 2012

SO ORDERED

*[signature]*

PAUL A. CROTTY

United States District Judge